## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JAMES P. LARWETH, an individual,

        *Plaintiff/Counter-Defendant*,

vs.

MAGELLAN HEALTH, INC., a Delaware
corporation,

        *Defendant/Counter-Plaintiff.*

**CASE NO: 6:18-cv-823-Orl-41DCI**

## PLAINTIFF/COUNTER-DEFENDANT JAMES P. LARWETH'S RESPONSE IN OPPOSITION TO DEFENDANT/COUNTER-PLAINTIFF MAGELLAN HEALTH, INC.'S MOTION FOR PRELIMINARY INJUNCTION

I.     **INTRODUCTION**

MGLN asks this Court to enter a preliminary injunction barring James Larweth from engaging in any business activity whatsoever in the broader healthcare and pharmaceutical industry. Their argument is simple: Larweth signed an employment agreement that contained sweeping restrictive covenants. As MGLN tells it, those restrictions must be enforced to the letter to uphold the sanctity of contract. But contracts in restraint of trade have never been sacred and often are illegal.

Upon Larweth's departure from MGLN, MGLN immediately spread word throughout the industry: Larweth had left the Company, was unlawfully competing against Magellan, was engaged in illegal conduct, and would soon be enjoined and shut down. That was March of 2018. But now, in March of 2019, MGLN comes to this Court for an injunction, clamoring about urgency and irreparable harm. MGLN's claims ring hollow. Since March of 2018, MGLN has known that Larweth would enter the market. In June and July of 2018, Larweth, through counsel, clearly communicated his position: The restrictive covenants at issue are overbroad and illegal under Connecticut law. Larweth would immediately begin *fairly and lawfully* competing against MGLN. There are no trade secrets at issue. There are no secret customer lists. The industry is one of open competition. And all of the customers are fair game. That was at least nine months ago. But now, there is an emergency.

By their very nature, emergencies are specific. MGLN talks in generalities. MGLN cannot talk in specifics or provide credible evidence in support of its contentions. MGLN's own witnesses cannot keep their stories straight. There is a wealth of testimony from MGLN's

own witnesses that undermines MGLN's case. MGLN hangs its hat on one premise: Larweth signed a contract and contracts must always be enforced. But that is simply not the law.

Any non-compete agreement must be evaluated through two separate lenses. The first lens is the antitrust or restraint of trade lens. The second lens is the contract lens. In evaluating a non-compete agreement through the antitrust lens, the Court must first consider whether the restriction at issue is necessary to protect a legitimate business interest. It is MGLN's burden to establish that, but for enforcement of the restrictions at issue, Larweth could engage in *unfair* competition. Only after the Court establishes that the restraint is reasonable, necessary, and permissible under antitrust principles does the Court turn to evaluating the case as a potential breach of contract matter. In the instant case, MGLN essentially skips the antitrust lens, offers only generic and self-serving allegations about legitimate business interests, and treats the case as a simple breach of contract matter. MGLN's analysis is completely wrong. When analyzed through the proper framework, MGLN's request for an injunction will be seen for what it is: A late-game effort to force Larweth out of the industry, prevent fair competition, and protect its supracompetitive margins. MGLN's Motion should be denied in its entirety.

## II.     FACTUAL BACKGROUND

### a.  The Carve Out Rebate Industry

"Rebates" are price discounts provided by pharmaceutical manufacturers to insurance companies (also known as health plans). Rebates are designed to incentivize health plans' coverage of a given drug or group of drugs, so that patients can access to them. These discounts are typically memorialized by service agreements and rebate contracts with pharmaceutical manufacturers. Separate agreements are then negotiated where health plans are offered

portions of those discounts. Health plans typically work with third-party pharmacy benefit management companies ("PBMs") to negotiate deals regarding the pharmaceuticals covered under their plans, including those eligible for rebates. PBMs are MGLN's direct competitors.

This dispute centers on the *carve out* rebate industry, a fast-paced and highly competitive offshoot of the traditional rebate industry. Kamal Dep. ("Ex. A") at 18:18-19:3. Entities such as MGLN and Anton Rx, LLC,[1] negotiate rebates with pharmaceutical manufacturers and attempt to 'carve out' specific drugs or lines of drugs from existing contracts between health plans and PBMs or competing carve out rebate administrators. Fletemeyer Dep. ("Ex. B") at 69:17-24. Companies like MGLN typically only work with health plans regarding a handful of the hundreds of drugs covered by the health plan formularies, while PBMs handle the overwhelming majority of the remaining drugs on the formularies. Petrovas Dep. ("Ex. C") at 36:21-37:18.

Price is king. The biggest factor influencing business acquisition or retention is not pre-existing relationships, but the amount of the rebate—or discounts—one can supply to a health plan. Larweth Dec. ("Ex. D") at ¶ 10. Carve out rebate companies do not have exclusive relationships with insurance companies. Health plans work with PBMs. Even if they retain the services of companies like MGLN, they will frequently terminate an agreement in favor of a competitor's better deal. *Id*. at ¶ 11-12. The contracts at issue can be terminated on 30, 60, or 90 days' notice, usually without penalty. *Id*. at ¶ 11. If a health plan decides to terminate a contract with MGLN, they simply do not get paid the previously negotiated rebate. In other

---

[1] Anton Rx, LLC ("Anton Rx") is a Florida limited liability company, which Larweth is a manager and executive vice president of. Larweth has no ownership stake in Anton Rx.

words, health plans are permitted to and frequently do negotiate new deals, mid-term, with MGLN or its competitors. It is not uncommon for insurance companies pit competitors against each other through bids, RFPs, or explicitly leveraging one company's rates against another's. Lederer Dep. ("Ex. E") at 54: 15-20; Sak Dep. ("Ex. F") at 125:19-25.

### b.  James Larweth

Larweth has worked in the pharmaceutical and rebate industry for almost twenty-five years. Long before he joined MGLN, Larweth developed countless contacts and relationships across the industry, called on dozens of health plans, and learned the ins-and-outs of rebate contract negotiations. Ex. D. at ¶ 1. In October 2011, following Larweth's first employment with MGLN, he joined CDMI, LLC ("CDMI"). Larweth was never an owner of CDMI. He had no equity, no authority to sell CDMI, and could not hire employees. *Id*. at ¶ 5; Ex. C. at 68:10-69:12.

Eventually, MGLN purchased CDMI. *See* DE 60-4; DE 35 at ¶ 20. In accordance with their CDMI employment agreements, approximately thirteen CDMI employees, including Larweth, were paid a bonus upon CDMI's sale. Ex. C at 70:19-21; DE 60-2 at § 3(d). MGLN then hired Larweth as a Senior Vice President of Business Development and required him to sign an employment agreement ("Agreement"). DE 35-1.

The Agreement contained restrictive covenants and incorporated portions of Larweth's CDMI employment agreement. *Id*. at §§ 4(c)(i) and 7. The Agreement sets forth that Larweth's "Bonus on Sale" was contingent only on Larweth being continuously employed by CMDI from the date of the Agreement and in good standing through the date of the closing. *Id*. Contrary to MGLN's continued assertions, payment of the bonus upon sale to Larweth was not predicated

on his compliance with the restrictive covenants contained in his Employment Agreement with MGLN. Larweth satisfied the applicable conditions and was paid the bonus upon sale. *Id*. at § 4(c)(i).

On January 5, 2018, MGLN terminated Larweth without cause. By March 13, 2018, MGLN began telling health plans that it would obtain an injunction against Larweth to shut down his new business. Caceci Dep. ("Ex. G") at 111:14-114:13. Since then, Larweth has repeatedly advised MGLN that he is competing and he has engaged in open competition. Larweth has not used any of MGLN's information. On March 15, 2019, more than a year since MGLN began threatening an injunction, MGLN filed its MPI.

## III.   <u>STANDARD</u>

MGLN must demonstrate: (1) a substantial likelihood of success on the merits; (2) that they will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, that the injunction would not be adverse to the public interest. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)). Because a preliminary injunction "is an extraordinary and drastic remedy," MGLN must "clearly" establish the burden of persuasion as to each of the four criteria. *Four Seasons Hotels v. Consorcio Barr*, 320 F.3d 1205, 1210 (11th Cir. 2003).

## IV.   <u>MEMORANDUM OF LAW</u>

### a.   **MGLN Does Not Have a Substantial Likelihood of Success on the Merits.**

MGLN must (1) demonstrate that the restrictions are enforceable, (2) demonstrate that Larweth breached the Agreement, and (3) defeat each of Larweth's affirmative defenses. *Lucky*

*Cousins Trucking, Inc. v. QC Energy Res. Texas, LLC*, 223 F. Supp. 3d 1221, 1226 (M.D. Fla. 2016). MGLN cannot satisfy any of these burdens. Restrictive covenants are, by definition, restraints of trade. *Deming v. Nationwide Mutual Insurance Company*, 279 Conn. 745, 761 (Conn. 2006). The Court must weigh the *reasonableness* of the Agreement's restrictive covenants. *Id*. at 761 (stating that reasonableness typically turns on "competing needs of the parties as well as the needs of the public" including "(1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists; (2) the employee's need to earn a living; and (3) the public's need to secure the employee's presence in the labor pool."). This is the heart of Connecticut's five-prong test to determine the reasonableness of a restrictive covenant. A finding that any factor is unreasonable is enough to render the covenant unenforceable. *New Haven Tobacco Co. v. Perrelli*, 18 Conn. App. 531, 534 (Conn. 1989).

### i.     The Restrictive Covenants Are Overly Broad and Must Be Struck

#### a.   *The Agreement's severability provision do not save the restrictive covenants.*

By their terms, the restrictive covenants at issue prohibit Larweth from engaging in any business that competes with MGLN and any of MGLN's present or future subsidiaries or affiliates. This restriction is grossly overbroad and goes far beyond any restriction that could be necessary to protect any legitimate business interest. For specific example, MGLN opted to not limit "Employer" to Magellan Rx, or Magellan Rx and certain subsidiaries. It extends to MGLN's subsidiaries, of which there are dozens. *See* Magellan Health, Inc. Subsidiaries, SEC Filing ("Ex. H"). The non-compete thus bars Larweth not just from engaging in the carve out rebate industry, but working for health plans, providing behavioral health services, or virtually any other service in the healthcare industry. The Agreement also expressly creates an open-

7

ended definition of whom Larweth is prohibited from competing with. *See* 35-1 at § 21, Construction. ("For the avoidance of doubt, references in Sections 7, 8, and 9 to Employer includes Magellan Health Services, Inc. and its present **and future subsidiaries** (including CDMI) **and its controlled affiliates**."). Since Larweth signed the Agreement, MGLN acquired, at a minimum, eight additional subsidiaries, bringing each of their business lines within the umbrella of prohibited markets. Similarly, the non-solicitation provision is not narrowly tailored. The provision's definition of "Customers" covers not just those entities that Larweth actually negotiated deals with, but any *potential* customers he knew of. *Id*. at § 7.

The Agreement contains a severability clause, but the blanket restrictions contained in the Agreement are simply too broad to be severed. They must be stricken in their entirety as violative of Connecticut public policy. *See, e.g., Samuel Stores, Inc.*, 94 Conn. 248 (Conn. 1919). Likewise, the restrictive covenants cannot be salvaged by "blue penciling." Connecticut has a strong aversion to "blue penciling," particularly in the non-compete context. *See, e.g. Beit v. Beit,* 135 Conn. 195, 204–205 (Conn. 1948). In fact, Connecticut law allows blue penciling only where, after words are stricken, there remains a "meaningful reasonable restriction." *Deming,* 279 Conn. at 769, n. 21. Because the restrictive covenants are grossly overbroad and cannot be salvaged by severing entire provisions, blue penciling is precluded and the restrictions must be struck in their entirety. *See, e.g., Sylvan R. Shemitz v. Brown*, 2013 WL 6038263, at *9 (Conn. Super. Ct. Oct. 23, 2013)

ii.   **The Restrictive Covenants are not Reasonably Necessary to Protect any Legitimate Business Interest**

a.   *MGLN Cannot Establish a Legitimate Business Interest in Confidential Information.*

Connecticut will enforce restrictive covenants where necessary to protect trade secrets or valuable, confidential information that is unique to the company and could be used to engage in unfair competition. *Scott v. General Iron & Welding*, 171 Conn. 132, 137 (Conn. 1976) Although Connecticut non-compete law applies, leading Florida non-compete cases regarding confidential information align with Connecticut jurisprudence and Florida has a far more robust body of relevant case law. Both Connecticut and Florida cases are cited *infra*.

i.   *MGLN Allegations About Confidential Information are Generic.*

MGLN's 'confidential' information falls into two generic buckets: (1) the preferences of specific customers and (2) rebate contract terms. MGLN's generic allegations do not carry the day. *See Lucky Cousins Trucking v. QC Energy*, 223 F. Supp. 3d 1221, (M.D. Fla. 2016) (denying preliminary injunction and rejecting generic claims of confidential information); *Vbrick Sys., Inc. v. Stephens*, 2009 WL 1491489, at *9 (D. Conn. May 27, 2009) (denying preliminary injunction where employer failed to offer any "evidentiary basis" for its assertion of protectable information).

ii.   *None of the At-Issue Information is Confidential.*

Larweth was a very talented salesman with 25 years of industry experience. Ex. D. at 1-3; Ex. C at 52:13-24. Larweth arrived at MGLN in 2014 with dozens, if not hundreds, of industry relationships and a wealth of market knowledge. Ex. D. at 1-3.

As a result of his work experience, Larweth knows the industry and the key players. There is no secret sauce. As Petrovas testified, he left MGLN and was able to start a competing business and win MGLN clients without using any confidential or proprietary information. Ex. C at 32:22-33:1, 48:20-24, 51:6-17. Health plans and pharma are in constant communication with competing rebate administrators and PBMs. They are looking for the best deal they can get. *Id*. at 107:20-108:16. Everybody is constantly shopping for a better deal. As a result, customer preferences and buying patterns are common industry knowledge. Information that is commonly known in the industry and readily available to a competitor does not constitute a legitimate business interest. *See, e.g., In re Maxxim Med. Grp., Inc.,* 434 B.R. 660, 685 (Bankr. M.D. Fla. 2010) (information commonly known in the industry and not unique to the company does not constitute a protectable interest); *Anich Indus., Inc. v. Raney*, 751 So.2d 767, 771 (Fla. 5th DCA 2000) (same).

MGLN relies on a litany of generic, self-serving statements and declarations. *See* DE 60, 60-1—60-6. MGLN is frantically attempting to manufacture confidential information where none exists. Deposition testimony carries more weight than MGLN's carefully-crated declarations. For example, Mr. Kamal's declaration posits Larweth "became familiar" with specific customer preferences and nuances "solely as a result" of his MGLN employment. DE 60-6 at para 16. In contrast, Mr. Kamal testified at his deposition that Larweth's best professional attribute was his deep industry knowledge and extensive industry experience. Ex. A at 101:9-19. The truth is that any industry veteran would have access to the exact sort of information that MGLN now claims is confidential. Ex. D. at ¶ 14. Multiple current or former MGLN employees provided testimony that glaringly contradicts MGLN's carefully-scripted

narrative and destroys any claims regarding confidential information. *See, e.g.* Ex. E at 16:18-20, 20:14-16, 24:13-17; Ex. C at 54:1-3; Ex. A 99:5-10, 124:17-22; Vecchiolli Dep. ("Ex. I") at 104:1-15.

### iii.   Any 'Confidential' Information has Grown Stale.

Larweth left MGLN on January 5, 2018. He created Anton Rx in June 2018. In the carve out rebate space, five months is an eternity. Often, health plans terminate rebate contracts in 30, 60, or 90 days. Ex. E at 38:20. The terms can be changed at any moment. *Id*. at 35:22. Even if Larweth was privy to the exact terms of *every* active MGLN rebate contract as of January 5, 2018 (and he was not), that information is now stale and useless. *See S.Wine and Spirits v. Simpkins*, 2011 WL 124631, *6 (S.D. Fla. Jan. 14, 2011) (denying injunction where information was "stale-and therefore not valuable-within two to six months.").

### iv.   Even if Larweth is Privy to MGLN's Confidential Information, he Cannot Use it to Unfairly Compete.

 MGLN cannot explain how Larweth could use the purportedly confidential information to gain an *unfair* competitive advantage. *See, e.g., Passalacqua,* 844 So. 2d at 796 (no legitimate interest in confidential information where plaintiff failed to articulate how its methods were unique and how defendant could use that information in unfair competition). MGLN cannot do so, particularly given its and Anton Rx's fundamentally different business models. MGLN has long relied on huge margins on carve out rebates to support its overhead. MGLN is multi-billion-dollar conglomerate. Anton Rx is a start-up. Larweth is a far more efficient market actor than MGLN. He gets business because he does not need to support massive overhead and, as a result, can offer far more competitive pricing.

### v.   *Larweth Does not Possess MGLN's Confidential Information.*

When he left MGLN, Larweth took only documents that he needed to prove his commissions owed. That information is from 2015-17, is now completely stale, and he has never used any of it in his new business. Ex. D at ¶ 13; Ex. F. at 139:9-12. Larweth turned those documents over to his counsel months ago and deleted them from his personal devices. Ex. D at ¶ 13.

### b.   *There Are No Protectable Customer Relationships at Issue*

Cases out of the Connecticut Supreme Court and the Connecticut appellate courts tie any protection of customer relationships to actual "customer lists." *See Scott*, 171 Conn. at 137; *New Haven Tobacco v. Perrelli*, 18 Conn. App. 531, 535 (Conn. App. 1989) (referencing the plaintiff's "protected customer list"). The Connecticut cases recognizing protection of "customer lists" and corresponding customer relationships did so only where the customer lists were valuable and proprietary. For instance, *Scott*, *supra*, involved a welding company. Protecting a list of welding customers 1976 cannot fairly be analogized to MGLN demanding that former employees not do business with large companies and national or regional health plans. That is because, in 1976, a list of welding clients would have been valuable, proprietary, and could have enabled the departing employee to engage in unfair competition. That makes sense. That same rationale does not apply here. Everyone in the industry knows who all of the players are. There are no protectable customer lists. Ex. C. at 52:22-24, 106:4-17; Ex. A at 124:17-22. MGLN cannot cite a single case that alters this fact: The names of pharmaceutical companies and health plans are not confidential. This moves the analysis out of any framework

based on proprietary customer lists and into an evaluation of the actual nature of the relevant markets and the relationships at issue.

The very nature of the industry and the relevant lines of business defeats any claim to the existence of protectable customer relationships. MGLN obtains an offer of drug rebates from a pharmaceutical company. MGLN then goes to a health plan that already has PBM. MGLN then attempts to "carve out" a small piece of rebate business from that PBM. For instance, MGLN may seek to handle rebates for that health plan pertaining to growth hormone drugs. MGLN competes for this rebate business against other companies focused on carveout rebates (e.g. Larweth's company Anton RX, Optum Inc., Remedy-One). But MGLN also competes against the PBM itself, which is attempting to prevent business from being carved out and, in some instances, competing to recapture lost business (i.e. carve in). Ex. I. 50:19-51:1. These various competitors submit bids and proposals. The health plan selects the winning bid based on overall value. The winning competitor gets to broker that particular rebate contract and retain a percentage of the rebates that would otherwise be passed on to health plans. The relationships are neither static nor exclusive. If a health plan has any carveout rebate business, then by definition, that health plan does rebate business with both their PBM and carveout companies. The market is incredibly volatile. Ex. J at 265:18-266:1. The contracts at issue are terminable on short notice, usually between 30 and 90 days. *Id.* Business can be won, lost, and won again.

The alleged customer relationships cannot be protected through non-compete or non-solicitation agreements. The customers are large entities. Their identities are publicly known. The market is highly competitive. The relationships are not exclusive. Much of the business

involves competitive bids or proposals. Allowing MGLN to use an employee non-compete agreement to restrict this sort of open competition does nothing to protect any legitimate business interest. Instead, it allows the MGLN to restrain competition solely for the purpose of restraining competition. "Protection against ordinary competition is not a legitimate business interest." *Lucky Cousins Trucking, Inc. v. QC Energy Res. Texas, LLC*, 223 F. Supp. 3d 1221, 1225 (M.D. Fla. 2016). Customer relationships in this context are not protectable. *See, e.g., IDMWORKS, LLC v. Pophaly*, 192 F.Supp.3d 1335, 1340-1341 (S.D. Fla. 2016) (no protectable customer relationship where relationship is not exclusive and customer could be easily identified by other competitors in the industry); *Evans v. Generic Solution Eng'g*, 178 So. 3d 114, 117-18 (Fla. 5th DCA 2015) (no protectable customer relationship where relationship was not exclusive; customer used multiple vendors and there was no reasonable expectation of continued business). Where the customers are public and business is won or lost based on competitive bids or proposals, customer relationships are clearly not protectable. *Shields v. Paving Stone Co., Inc.*, 796 So. 2d 1267, 1268-69 (holding restrictive covenants unenforceable where information on customers was publicly available, customer relationships were not exclusive, and contracts were awarded through competitive bidding).

Further, MGLN is not just seeking to prohibit Larweth from doing business with a handful of specific customers. It seeks to bar him completely from the broader healthcare market. There are hundreds of potential clients (primarily national and regional health plans). MGLN's own admissions clearly establish that its main concern is a small subset of the relevant market. Throughout these proceedings, MGLN has demanded Larweth agree not to do business with approximately 10 to 15 customers. Among those core 15 are customers that

no longer do business with MGLN and already do business with Larweth. In spite of MGLN's true focus being a limited universe of 10 to 15 customers, it is now dramatically overreaching and seeking to bar Larweth from the entire industry. There is no reasonable basis in law or fact for restricting Larweth from conducting business with any customers, let alone a basis for barring him from the industry as a whole.

### c.   MGLN Cannot Defeat Larweth's Affirmative Defenses

Larweth has not yet filed his affirmative defenses but will ultimately raise several. MGLN must defeat each affirmative defense. *See, e.g., Black and Decker v. Hoover Serv.*, 765 F.Supp. 1129, 1134 (D. Conn. 1991); *Lucky Cousins*, 223 F. Supp. 3d at 1226 (M.D. Fla. 2016).

### i.   MGLN Waived its Right to Seek Enforcement

MGLN has allowed more than a dozen employees to leave and join or start competing ventures without filing suit. In each instance, MGLN had the right to seek enforcement, clearly knew of this right, and intentionally relinquished it with regard to similarly situated ex-employees. This is waiver. *See Bueno v. Workman*, 20 So. 3d 993, 998 (Fla. 4th DCA 2009).

### ii.   MGLN's Claims are Barred by Prior Breach

Under his Agreement, Larweth was entitled to annual bonuses.35-1 at § 4(b). His 2015 bonus plan was incorporated by reference into the Agreement. *Id*. MGLN failed to pay Larweth more than $1 million in accordance with the bonus plan. As such, MGLN materially breached the Agreement. Its claims are barred by the doctrine of prior breach.

### iii.   MGLN has Unclean Hands

MGLN defamed Larweth to his peers and contacts within the industry, saying he was engaged in illegal conduct and unfair competition. MGLN breached its contract with Larweth

and unjustly enriched itself by failing to pay Larweth his bonus compensation. MGLN punished Larweth by terminating his employment after he internally blew the whistle on perceived antitrust violations involving price collusion between MGLN and pharma. A party is not entitled to equitable relief when it comes to the court with unclean hands.

### iv.   Enforcement is Barred by Laches

Despite being aware of Larweth's competition, MGLN waited—at the very least—nine months to attempt to enjoin Larweth. MGLN's delay is unreasonable and bars injunctive relief.

### b.   There is no Threat of Irreparable Harm

MGLN cannot prove irreparable harm. That alone is fatal. *See Moon v. Med. Tech. Assocs., Inc.*, 577 F. App'x 934 (11th Cir. 2014) (collecting authorities and stating that the party seeking a preliminary injunction "bears the burden of clearly establishing it will be harmed in the future by an actual and imminent injury for which adequate compensatory or other corrective relief will not be available").

### i.   *Magellan's Delay in Seeking Injunctive Relief Destroys Any Claim of Irreparable Harm*

Delay weighs strongly against granting a preliminary injunction. *See, e.g., Wreal v. Amazon.com,* 840 F.3d 1244, 1248 (11th Cir. 2016) (affirming denial of injunction following five-month delay); *Regs. Bank v. Kaplan*, 2017 WL 3446914 (M.D. Fla. Aug. 11, 2017) ("*Gen. Parts Distrib. LLC v. Enright*, 2014 WL 172116, at *7 (M.D. Fla. Jan. 10, 2014) (eight-week delay in seeking preliminary injunction "weigh[ed] against a finding of irreparable harm").

No later than March 2018, MGLN suspected that Larweth was engaged in a competing business when they warned multiple health plans including AscellaHealth, CenCal, Horizon, and Health that Larweth would shortly be subject to an injunction and shut down. Ex. G at

111-113. As such, MGLN was raising the threat of an injunction more than a full year before seeking injunctive relief. Larweth began Anton Rx, a competitive business, in June 2018. On June 5, 2018, the undersigned counsel to counsel for MGLN unequivocally and in writing: "Larweth will be re-entering the rebate sales market immediately." DE 60-7 at 1. On July 13, 2018, the undersigned counsel told MGLN's counsel that "[u]nless and until [MGLN] proves the restrictions enforceable and obtains an injunction, Larweth is free to compete." DE 60-9 at 17. In July 2018, rather than hiding his actions. Larweth created a public LinkedIn account for Anton Rx and sent connection requests to multiple current and former MGLN employees. Ex. D at ¶ 15. MGLN still did nothing. Instead, MGLN delayed another nine months to seek an injunction. This protracted delay belies the notion of any actual or imminent irreparable harm and is – by itself – dispositive. *See Wreal, LLC*, 840 F.3d at 1248; *Pals Crp., Inc. v. Quiskeya Trading Corp.*, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) (denying injunction after three-month delay in seeking relief because "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.") (collecting cases).

### ii. *The Industry and Magellan's Actions Therein Demonstrate a Lack of Irreparable Harm*

Health plans choose rebate contract administrators who can offer the most value, typically in the form of appealing margins. Ex. A at 74:3-15, 79:9-22; Ex. E at 46:7-15; Ex. F 119:8-12. Rebate contracts can be terminated on as short as 30 days' notice. Ex. E. at 38:20. Business may be lost but won back the following year. Ex. A at133-34; Ex E at 34:9-17, 54:15-20. Losing a customer does is not irreparable harm, as the business is volatile, rapidly changing, and increasingly competitive. Ex. F at 119:8-12; Ex. A at 78:3-9, 98:21-24.

Further, numerous MGLN employees who are not bound by any restrictive covenants had the same access to its supposedly confidential information and customer relationships but are completely free to engage in competitive business. For example, former MGLN sales executive Mr. Caceci, described as a "player coach" given his instincts and industry understanding, was not subject to any restrictive covenants. Ex. G at 125:3-4; Ex. I at 59:6-12. Caceci was privy to, the same information as Larweth if not more. *Id*. at 91:5-92:16.

Similarly, MGLN chose not to enforce restrictive covenants against Adam Wiatrowski, Larweth's former boss. Wiatrowski necessarily had access to more MGLN information than Larweth and immediately started a competing company, Revere Medical Management, LLC ("Revere"). Revere hired four employees, including Caceci, from MGLN. MGLN did nothing. The same happened with Mike Waterbury, the former President of ICORE Healthcare, LLC, who had a one year non-compete agreement. Upon his termination, Mr. Waterbury immediately started the competing business Remedy-One. Ultimately, ten other former-MGLN employees left MGLN to work for Remedy-One. *See* Composite Linkedin Profiles ("Ex. K"). MGLN did not pursue a lawsuit or injunctive relief. All of these individuals had access to the same information as Larweth if not more. MGLN did nothing. This destroys MGLN's claim of irreparable harm.

### iii.   *Magellan's Alleged Damages are Quantifiable and not Irreparable*

MGLN has adduced no evidence that once lost, a client is lost forever. Clients come and go and come back. It hinges on competition, value and pricing. Likewise, MGLN has not adduced any evidence of damage to customer goodwill. Instead, MGLN's alleged damages boil down to lost short-term contracts, each of which has quantifiable monetary value. DE 60

at 23-25. As such, a preliminary injunction is inappropriate. *Moon*, 577 F. at 937 (movant must clearly establish "it will be harmed in the future by an actual and imminent injury for which adequate compensatory or other corrective relief will not be available."). *Cf. Anago Franchising v. CHMI*, 2009 WL 5176548, at *14 (S.D. Fla. Dec. 21, 2009) (holding "An alleged breach of a non-competition clause does not automatically create an inference of irreparable harm" and finding damages could be quantified); *Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1376 (N.D. Ga. 2001) (same).

### c. The Public Interest Disfavors an Injunction

For years, MGLN has retained rebates at supracompetitive levels. Larweth lacks MGLN's massive overhead and can provide the same services at a much lower cost. The result is that those rebates are passed on to health plans, thereby lowering the cost of prescription drugs to consumers. Record evidence shows that MGLN: (1) retained 25% of the available rebate from Health Partners while other market actors passed through 100% of the rebate to the health plan Ex. G 103:25-05:8 and (2) routinely colludes with pharmaceutical manufacturers to maintain high prices, *id*. at 140:2-6. The public interest strongly outweighs any interest MGLN has in enforcing an unlawful restrictive covenant.

### d. The Balance of Equities Supports Larweth

The Agreement impermissibly attempts to cut Larweth from the industry in which he has spent the last 25 years. *See Sylvan*, 2013 WL 6038263 at *9 ("The test for reasonableness is not whether the defendants would be able to make a living in other ways, or in other occupations, but whether or not the Agreement as drafted and applied would unfairly restrain

their 'opportunity' to pursue their occupation."). MGLN's interest is predicated on little more than removing a competitor in an increasingly competitive arena.

### e.   Larweth is Entitled to An Evidentiary Hearing Under Rule 65

MGLN's MPI is so facially deficient that its request for an injunction can be denied on the papers. *See, e.g., Lucky Cousins*, 223 F. Supp. 3d 1221 (M.D. Fla. 2016) (denying motion for preliminary injunction on the papers where movant made similarly generic allegations and failed to establish any legitimate business interest). Conversely, the relief MGLN requests – barring Larweth from doing anything remotely related to healthcare, insurance, or the pharmaceutical industry – should not be granted without an evidentiary hearing. Larweth contests all of MGLN's central allegations and directly questions MGLN's credibility. An evidentiary hearing is required. *See, e.g., Moon* , 577 F. App'x at 936 (11th Cir. 2014) (vacating preliminary injunction in non-compete case and remanding for evidentiary hearing and collecting cases); *CBS Broadcasting v. EchoStar Communications*, 265 F.3d 1193, 1207 (11th Cir. 2001) ("[W]here much depends upon the accurate presentation of numerous facts, the trial court erred in not holding an evidentiary hearing to resolve these hotly contested issues."). Naturally, MGLN wants to avoid such a hearing because many of their key factual allegations fall apart when scrutinized. MGLN simply is not credible. Consider the following:

- MGLN previously sued Petrovas, Larweth, and CDMI alleging breach of non-compete agreements and theft of trade secrets. *See* Comp. *MGLN v. CDMI* Litigation ("Ex. L") Petrovas testified that CDMI did nothing wrong, was engaged in fair competition, and did not use any of MGLN's confidential information. Ex. C at 30:10-18, 53:19-22. Petrovas testified that he introduced Larweth to numerous clients, but he could only recall two

specific client introductions. *Id.* at 133:1-18. In the same deposition, Petrovas also testified that he and Larweth had relationships from years spent working in the industry. *Id.* at 52:18-19.

- During his deposition testimony and while on the record, MGLN's counsel passed Petrovas a hand-written note. Petrovas abruptly ended his answer to accept the note and read it. This entire exchange is captured on the transcript. *See* Ex. C at 165. After the note incident, MGLN's counsel repeatedly attempted to recess the deposition. *Id.* (Ms Cox: Let's take a quick break. I want to talk to you outside. Are you done with that answer?). A moment later, the undersigned counsel agreed to a "thirty second" break. MGLN's counsel and the witness left the room and held a sixteen minute meeting.

These are two examples among many that undercut MGLN's credibility. Larweth should be permitted to test MGLN's witnesses and subject them to cross examination, without any improper interference, and where the Court can evaluate their credibility.

### f. Any Preliminary Injunction Should Be Conditioned On A Bond Of At Least $30 Million

Larweth's new venture has secured approximately $8.8 million of business for 2019. That is business already won. It is not yet April. Larweth's Anton ventures can demonstrate potential earnings of at least $30 million for this year alone. MGLN is not entitled to an injunction that could potentially cost Larweth more than $30 million unless it provides adequate security against the risk of a wrongful injunction. Any bond should be set only after a separate evidentiary hearing to establish the bond amount.

### CONCLUSION

For the reasons set forth above, Magellan's Motion should be denied.

Dated: March 29, 2019            Respectfully submitted,

By: /s/ *Christopher Prater*
Christopher S. Prater
Florida Bar No.: 105488
cprater@pollardllc.com

Jonathan Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com
**Trial Counsel**

**Pollard PLLC**
401 E. Las Olas Blvd.
Suite #1400
Fort Lauderdale, Florida 33301
Telephone: (954) 332-2380
Fax: (866) 594-5731
*Attorneys for Plaintiff/Counter-*
*Defendant, James P. Larweth*

## <u>CERTIFICATE OF SERVICE</u>

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via e-mail to all counsel of record in this action on March 29, 2019.

By: /s/ *Christopher Prater*
Christopher S. Prater